**E-FILED**
Thursday, 01 September, 2005  01:53:40 PM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF ILLINOIS
# SPRINGFIELD DIVISION

| | | |
|---|---|---|
| CONNIE COLEMAN and | ) | |
| SARA LYONS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.  02-3024 |
| | ) | |
| BUCHHEIT, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on Defendant Buchheit, Inc.'s (Buchheit) Motion for Summary Judgment (d/e 53) (Motion for Summary Judgment), and Plaintiffs Connie Coleman and Sara Lyons' Motion for Partial Summary Judgment Proscribing Defendant's Assertion of the Ellerth/Faragher Affirmative Defense (d/e 101) (Motion for Partial Summary Judgment).[1]  See Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765

---

[1] When Plaintiffs filed their Motion for Partial Summary Judgment, they erroneously filed it in the Court's electronic case filing system as a "Memorandum in Opposition to Defendant's Motion for Summary Judgment."  See d/e 74.  To correct Plaintiffs' error, this Court ordered the Clerk of the Court to re-docket Plaintiffs' Partial Motion for Summary Judgment.  See August 22, 2005, Text Order.

1

(1998); <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998).  Buchheit

seeks summary judgment on Plaintiffs Coleman and Lyons' claims against

it for sexual harassment (Counts I & II), and retaliation (Counts III & IV),

under Title VII, 42 U.S.C. § 2000 <u>et seq.</u>, and Coleman's claim for

constructive discharge (Count V).  <u>See</u> <u>First Amended Complaint (d/e 17)</u>.

Plaintiffs seek partial summary judgment on Buchheit's assertion of the

<u>Ellerth/Faragher</u> affirmative defense.  For the reasons set forth below,

Buchheit's Motion is allowed, in part, and Plaintiffs' Partial Motion is

allowed, in part.  Issues of fact exist regarding whether Buchheit can prevail

on its <u>Ellerth/Faragher</u> affirmative defense with respect to Lyons, but not

with respect to Coleman; Buchheit cannot prevail on its <u>Ellerth/Faragher</u>

affirmative defense with respect to Coleman.  Thus, Coleman is entitled to

partial summary judgment on the <u>Ellerth/Faragher</u> affirmative defense, but

Lyons is not.  The sexual harassment claims in Counts I and II must go to

trial, and Buchheit's defense with respect to Lyons must go to trial.

Buchheit is entitled to summary judgment on the remaining claims for

retaliation and constructive discharge.

STATEMENT OF FACTS

Lyons began working for Buchheit in August 2000, as a cashier at the

2

Jacksonville, Illinois, store.  Coleman was hired September 10, 2001, also as a cashier at the Jacksonville, Illinois, store.  At all times during Plaintiffs' employment, Mark Johnston was an Assistant Store Manager, Wanitta Beck was Department Manager of the Clothing Department, and Donna Tegeder was the Inventory Control Manager, at the Jacksonville, Illinois, store.  At all times during Plaintiffs' employment, Richard Williams was the Director of Loss Prevention for Buchheit.  In December 2000, George Cash became the General Store Manager of the Jacksonville, Illinois, store.

Upon hiring, both Coleman and Lyons received a Buchheit Team Member Handbook (Handbook) that set forth Buchheit's sexual harassment policy.  In relevant part, that policy provided:

<u>Policy Prohibiting Sexual Harassment</u>

Sexual harassment in the work place is unacceptable conduct, and we will treat sexual harassment like any other form of misconduct.  Team members who believe they may have been sexually harassed should discuss the matter with their supervisor, with Sue Blessing, with Rich Williams or with any Buchheit family member.  Team members must call the attention of management to this type of problem within 180 calendar days of its occurrence.

Sexual harassment is unwelcome sexual behavior by a manager or any team member that unreasonably interferes with another team member's work performance.  Sexual harassment includes subtle pressure for sexual activity, inappropriate

3

touching, inappropriate language, and demands for sexual favors.

Plaintiffs' Summary Judgment Exhibits (d/e 77, 78, 79) (Plaintiffs' Response Exhibits), (d/e 77) Exhibit 4.[2]  A revised version of this portion of the Handbook stated that an employee could contact her supervisor, Vickie Hutto, Williams, or a member of the Buchheit family.  The Buchheit sexual harassment policy was explained at the time of hire.   Id., Plaintiffs' Statement of Additional Facts Which Require the Denial of Defendant's Summary Judgment Motion Pursuant to Local Rule 7.1(D)(2)(b)(4) (d/e 72) (PUF), ¶ 272.

The Handbook also contained a section entitled Problem Solving Process.  That section of the Handbook instructed employees to discuss problems with any manager in their chain of command.  Plaintiffs' Response Exhibits (d/e 77), Exhibit 4.  If that did not work, the employee was instructed to submit the complaint in writing to certain people in Buchheit's management hierarchy, Williams, Blessing, Regina Rose, or Lisa Hacker.  Finally, the employee could discuss the problem with Tim or Jon Buchheit.

---

[2]Plaintiffs filed their exhibits in three different filings, docket entries 77, 78, and 79.  Plaintiffs also employ exhibit numbers that do not relate to the exhibit numbers assigned at the time of filing.  The Court will refer to Plaintiffs' exhibits by the docket entry number and the exhibit number that is reflected on the Court's docket.

The Problem Solving Process section further stated that sexual harassment could be handled like any other problem.  Id.

Further, Buchheit posted a "Harassment Prevention" poster at some point in time.  Lyons stated that it was present in the break room the entire time of her employment, from August 2000, forward, and the names of managers to call listed on the poster were updated from time-to-time. Motion for Summary Judgment, Defendant's Undisputed Facts (DUF), ¶ 27.  However, Beck testified that the Harassment Prevention poster was posted in the summer of 2002.  Plaintiffs' Response Exhibits, Declaration of Wanitta Beck, ¶ 11.  Williams, the man responsible for directing that the poster be posted, could not recall when it was posted.  Plaintiffs' Additional Facts, ¶ 253.

Several months after Lyons began working for Buchheit, Johnston allegedly touched Lyons on the shoulders and made her feel uncomfortable.[3] At the time, Lyons was supervised by Carrie Carrington, a Customer Service

---

[3]For purposes of its Motion only, Buchheit does not dispute Plaintiffs' allegations of sexual harassment.  Motion for Summary Judgment at 2 n.1.  Hence, for the purposes of Buchheit's Motion, the Court will assume that Johnston's conduct created a hostile work environment for Coleman and Lyons.  Plaintiffs' Motion for Partial Summary Judgment does not ask for summary judgment on the issue of whether Johnston's conduct created a hostile work environment; their Motion only addresses whether Buchheit can raise the Faragher/Ellerth affirmative defense.  Plaintiffs' Motion for Partial Summary Judgment at 1.

Manager, and Lyons' Department Manager.  Lyons talked with Carrington about this incident twice, several weeks apart.  <u>Motion for Summary Judgment</u>, <u>DUF</u>, ¶¶ 102-03.   In the first conversation, Lyons asked Carrington, "does [Johnston] rub people's shoulders a lot[?] . . . and [Carrington responded], 'Yeah, that's just his way of being friendly.'"  <u>Id.</u>; <u>Plaintiffs' Response Exhibits (d/e 79)</u>, Exhibit 21, <u>Deposition of Sara Lyons (Lyons Deposition)</u> at 33.   Lyons told Carrington that she had been surprised by Johnston's conduct.  <u>Id.</u> at 34.  Carrington followed up with Lyons a few weeks later to see "how [Lyons] was doing with" Johnston's conduct.  <u>Id.</u>  Lyons did not testify as to how she responded to Carrington's follow-up.  <u>Id.</u>  Carrington quit working for Buchheit sometime shortly after this second conversation.

Johnston's conduct allegedly worsened, escalating to include inappropriate sexual comments, touching, and jokes.  Lyons attested that Johnston began sexually harassing her on almost a daily basis.  <u>Motion for Summary Judgment</u>, <u>DUF</u>, ¶ 41.   Lyons began complaining about Johnston's conduct to Beck on an almost daily basis.  <u>PUF</u>, ¶¶ 300-01.  It is unclear from the record who served as Lyons' Department Manager after Carrington left Buchheit.  Lyons states that some time after Carrington left,

she moved to the Clothing Department, and Beck was then her supervisor. PUF, ¶¶ 30-31, Lyons Deposition at 37.  Buchheit states that in February 2002, Lyons was transferred from her position as cashier to Low and Out Coordinator and then reported directly to Cash.  Defendant's Reply to Plaintiffs' Response to Defendant's Motion for Summary Judgment (d/e 92), at 6.  Buchheit, however, does not present any evidence concerning who supervised Lyons from the time that Carrington left until February 2002.

From August 2001 through January 2002, Lyons stated that she sought treatment for depression related to Johnston's sexual harassment. PUF, ¶ 496.  She attested that she had been treated for depression from her sophomore year through her junior year of high school, although it had abated until Johnston's alleged sexual harassment began.[4]  Id.

On September 12, 2001, two days after Coleman began working for Buchheit, she was present when co-employee Lindsay Delay filed a sexual harassment complaint against Kenny Stephenson.  It is unclear whether Coleman was otherwise involved in the process.  A month later, in October 2001, Coleman served as a witness in the sexual harassment investigation

---

[4]Lyons was 19 years old in August 2000 when she began working for Buchheit.

of Buchheit employee David Gutmann, also filed by Delay.  Motion for Summary Judgment, Exhibit 3, Affidavit of Richard Williams (Williams Affidavit), ¶ 9, and Exhibits A & B.  Williams, the person responsible for all internal investigations for the company, including sexual harassment complaints, conducted the investigation.  PUF, ¶ 46.  Williams interviewed Coleman, who testified that Gutmann had done nothing wrong.  Williams Affidavit, ¶ 9.

In December 2001, Coleman was transferred from her position as a cashier to work in the Clothing Department under Beck's supervision.  About this time, Johnston allegedly began sexually harassing Coleman on a weekly basis.  Id., DUF ¶ 2.  Johnston's alleged sexual harassment included inappropriate sexual comments, touching, and jokes.  In addition, Johnston allegedly sexually harassed Beck with similar conduct.

Coleman reported Johnston's alleged sexual harassment to Beck, her Department Manager, after Christmas 2001.  PUF, ¶ 290.  Coleman complained to Beck twice, and then again in February 2002.  Id., ¶ 292.  Thereafter, Coleman began complaining to Beck about Johnston's alleged sexual harassment on a daily basis.  Id., ¶ 293.  At some point, Beck told Coleman that if Coleman wanted to keep her job, she should keep her

mouth shut about Johnston's conduct.[5]  Id., ¶ 295.

In February 2002, Lyons was transferred to a part-time position as the Low and Out Coordinator.  She spent the remainder of her time as a cashier, in the Clothing Department and other areas of the store.  In her Low and Out position, she reported to Cash.  Lyons stated that in the Clothing Department, she reported to Beck.[6]  Shortly thereafter, Lyons requested a more physical assignment, so Cash re-assigned her from the part-time cashier position to a part-time Receiving Department position. Motion for Summary Judgment, Cash Affidavit, ¶ 11.

In June 2002, Coleman was transferred from the Clothing Department to the Contract Sales Department, which made Johnston Coleman's direct supervisor.  Motion for Summary Judgment, Exhibit 7, Cash Affidavit, ¶ 8; PUF, ¶ 26.  Coleman and Beck attempted to forestall this transfer because of Johnston's alleged sexual harassment of Coleman.  When questioned by Cash why he should not transfer Coleman, however, Coleman only told

---

[5]The Court notes that Buchheit disputes Coleman's statement because Beck's Affidavit does not mention it; Beck's silence, however, does not contradict Coleman's statements.  Buchheit presents no evidence that contradicts Coleman's account.

[6]It is unclear who Lyons' Department Manager was when she worked as a part-time cashier.  Buchheit disputes that it was Beck, but does not state who supervised her. Defendant's Reply to Plaintiffs' Response to Defendant's Motion for Summary Judgment (d/e 92) at 6.

Cash that she had a personality conflict with Johnston, so Cash approved the transfer.  See Plaintiffs' Response Exhibits (d/e 79), Exhibit 19, Coleman Dep. at 71-72.  Cash promised her a raise with the transfer, but she never received it.  Coleman Dep. at 93.  In her new role, Coleman worked as a cashier and as a sales person in the Tool Department.  Cash Affidavit, ¶ 17.  At some point, Johnston approved Coleman for a four-day per week reduced work schedule, and she was allowed to keep her full-time benefits.  Id., ¶ 9.

Also in June 2002, Cash and Williams counseled Buchheit employee Tim Edwards for sexually harassing a co-employee named Jessica Graves.  The same day that Edwards received the discipline, he was terminated by Cash for failing to abide by the discipline given to him.  Id., ¶ 7, and Exhibit D.

On July 23, 2002, Lyons approached Tegeder, the Inventory Control Manager (who was not a supervisor), and told her about Johnston's alleged sexual harassment.  Lyons was very upset and in tears.  Lyons then brought Beck, and another co-employee Tina Jones, into the meeting with Tegeder.  They all stated that they had been subjected to alleged sexual harassment by Johnston.  Tegeder then called Erika Hahn, one of the persons specifically named on the Harassment Prevention poster as a contact person

for sexual harassment, to report the women's issues.  Coleman was not a part of this group.  Tegeder requested that Hahn not inform Williams or Cash of their complaints.  Accordingly, Hahn informed Reid Willen, Buchheit's chief financial officer, of the women's complaints.

On July 24, 2002, Tegeder, and three or four other women, called Hahn and requested that Buchheit management take action the following day, July 25, 2002, because Johnston was scheduled to be out of the store. Hahn informed Willen, who then scheduled a trip to the Jacksonville store with Hahn for July 25, 2002.  Soon thereafter, however, Tegeder called Hahn again, and asked her to put off the scheduled trip for several weeks because Johnston had seen all the women talking together.  Tegeder feared that Johnston would guess that they were the ones who had complained. Hahn informed Willen of Tegeder's request, but he said the situation sounded too serious to wait.  On July 25, 2002, Willen and Hahn interviewed approximately 10 Jacksonville store employees.  Both Coleman and Lyons were interviewed and recounted Johnston's alleged sexual harassment.

Jon Buchheit, Director of Store Operations, was informed of the Jacksonville employees' complaints.  Jon Buchheit decided not to terminate

Johnston because he had never been cited for sexual harassment before, and several employees did not want Johnston fired if he would stop his offensive conduct.

On July 26, 2002, Williams, Cash, and Willen gave Johnston a "last chance corrective disciplinary action." Williams Affidavit, ¶ 12. Williams confronted Johnston with the complaints, and informed him that because so many employees (both female and male) had corroborated each other's accounts, he was not interested in any explanation from Johnston. DUF, ¶ 73. Williams informed Johnston that he was not to retaliate against any of the complaining employees. He also noted that all of the allegations would be documented, and Johnston's employment was now on a "last chance basis." DUF, ¶ 74. Johnston refused to sign the discipline sheet. Johnston retained his position, pay, and authority.

On July 29, 2002, Williams returned to the Jacksonville store to inform employees of Buchheit's action against Johnston, and re-interview them about their complaints. Williams specifically directed all the female complainants to follow Johnston's orders, even if they felt they were unreasonable. Plaintiffs' Response Exhibits (d/e 79), Exhibit 13 Williams Dep. at 93. Williams explained that he did not want the female

complainants to get into trouble for insubordination with Johnston.  Id. at
94.  When interviewed on July 29, 2002, Coleman told Williams that she
felt Johnston should have been fired.

Williams prepared type-written summaries of the complainants'
statements to Hahn and Willen on July 25, 2002, and to Williams on July
29, 2002.  In the summary Williams prepared for Lyons, Lyons stated that
she went home every night feeling like Johnston's harassment was her fault.
Williams Affidavit, Exhibit N.  Williams also summarized the employees'
complaints, and the events of July 23rd-29th, 2002, in an incident report.
Williams Affidavit, Exhibit M.  Williams states that he told Cash about
Lyons' emotional difficulty with Johnston's alleged harassment, and Cash
asked Lyons if she would like help under Buchheit's Employee Assistance
Program.  DUF, ¶ 96.  Lyons refused the help, explaining that she was
already under a doctor's care.

Lyons testified in her deposition that after the July 2002 discipline,
Johnston rubbed his walkie-talkie antenna up the crotch or butt of Beck on
two occasions, rammed a cart into Beck's crotch and butt on two separate
occasions, and still made sexual comments, but Johnston denies it.
Compare Plaintiffs' Response Exhibits (d/e 79), Exhibit 22 Lyons Dep. at

13

32, 114-15, with Plaintiffs' Response Exhibits (d/e 79), Exhibit 21 Johnston Dep. at 24-27, 34-41.  Lyons and Coleman stated that Johnston did not touch them after the July 2002 discipline.

After July 2002, however, several women at the Jacksonville store, including Coleman and Lyons, had trouble getting male employees to help them with their work.  Some men made snide comments to Coleman or turned their backs on her when she was speaking to them.  Coleman often needed help moving and lifting heavy objects, including compressor tanks, toilets, sinks and tools.  Before July 2002, men who operated forklifts helped her move objects; thereafter, they would not help her. Lyons was forced to move heavy palettes with the floor jack.  PUF, ¶¶ 411-41.  After the sexual harassment investigation, an assistant manager, Janet Strubble, told Lyons that she would get the "shit jobs."  Id. at ¶ 426.  On a near-daily basis, Johnston would warn her to walk away if she did not want to hear an offensive joke, or he would say, "Oh, I better not say that.  That might be considered sexual harassment."  PUF, ¶ 363; Coleman Dep. at 6-8.

Coleman reported these problems to Williams.  She told him that if things did not improve, she would have to quit.  Williams said that he did not want her to quit, and he would see what he could do.  According to the

Plaintiffs, he did not contact her again and did not follow up with Cash. PUF, ¶¶442-71.  Coleman and others also reported problems to Cash, but again, according to the Plaintiffs, nothing was done.  Id. at ¶¶ 472-79. Williams prepared an interview summary of his discussions with Coleman on August 22, 2002.  According to Williams' summary, Coleman said that Johnston's alleged sexual harassment was making it more difficult for her to deal with her depression.  Id., Williams Affidavit, Exhibit W.

Coleman resigned from Buchheit's employ in September 2002. Motion for Summary Judgment, DUF, ¶ 31.  Coleman resigned because of the snide comments, the heavy lifting problems, the cold shoulder treatment from male employees, and the failure to give her the raise that she was promised when she transferred to the Contract Sales Department.  Coleman Dep. at 93, 95-96.  Coleman also was informed when she transferred to the Contract Sales Department that she would be expected to attend an annual two-day meeting out of town, and that Johnston would also attend that meeting.  As soon as she found out about the meeting, she told Cash that she refused to go.  She stated in her deposition that this scheduled out-of-

town meeting had nothing to do with her decision to resign.  Id. at 104.[7]

Williams continued to monitor the situation at the Jacksonville store. He met with a number of employees on November 18, 2002, and with Lyons and Diana Shanks on January 30, 2003.  Id., DUF, ¶ 93.  None of the employees reported any further sexual harassment by Johnston.

## ANALYSIS

Plaintiffs claim that Buchheit is liable under Title VII for sexual harassment and retaliation, and Coleman claims Buchheit is liable for Title VII sex discrimination that led to constructive discharge.  Buchheit moves for summary judgment on all of the Plaintiffs' claims.  Buchheit argues that it is entitled to summary judgment on the sexual harassment claims based on the Ellerth/Faragher affirmative defense.  Buchheit argues, further, that Plaintiffs have failed to present evidence of actionable retaliation or constructive discharge.  Plaintiffs move for partial summary judgment, arguing that the undisputed facts show that Buchheit cannot successfully raise the Ellerth/Faragher affirmative defense.

---

[7]Williams' interview notes also indicate that Coleman told him that her schedule changed to mostly nights after she said something to Johnston about his language. Plaintiffs' Response Exhibits (d/e 79), Exhibit 13, Williams Dep. at 106.  The "night shift" worked until the store closed at 8:00 p.m.  Defendants' Reply (d/e 92), Exhibit 5, Supplemental Affidavit of George Cash, ¶ 5-6.  Buchheit's payroll records show that throughout 2002, Coleman generally worked two nights per week until closing.  Id.

At summary judgment, the movant must present evidence that demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The Court must consider the evidence presented in the light most favorable to the non-moving party. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Once the moving party has produced evidence showing that it is entitled to summary judgment, the non-moving party must present evidence to show that issues of fact remain.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  When viewed in the light most favorable to the non-moving party with respect to each motion, the Court concludes that issues of fact remain as to whether Buchheit can prevail on its Ellerth/Faragher affirmative defense with respect to Lyons, but cannot prevail on the defense with respect to Coleman.  The Plaintiffs' sexual hostile work environment claims, and Buchheit's assertion of this affirmative defense with respect to Lyons, must go to trial.  Plaintiffs, however, have failed to present evidence of either actionable retaliation or constructive discharge.  Buchheit is, thus, entitled to summary judgment on these claims.

I. <u>HOSTILE WORK ENVIRONMENT CLAIMS AND THE ELLERTH/FARAGHER AFFIRMATIVE DEFENSE</u>

Plaintiffs claim that they were subjected to a hostile work environment caused by Johnston's sexual harassment.   Title VII prohibits sexual harassment in the workplace that is severe enough to create a hostile work environment.  42 U.S.C. § 2000e <u>et seq.</u>  For purposes of its Motion only, Buchheit assumes that Plaintiffs were subjected to hostile work environment sexual discrimination.  <u>Defendant's Motion</u> at 43-44.  Buchheit claims that its is entitled to the <u>Ellerth/Faragher</u> affirmative defense.

To prevail on the <u>Ellerth/Faragher</u> affirmative defense, Buchheit must establish two elements:

> When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see <u>Fed. Rule Civ. Proc.</u> 8©).  The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

<u>Ellerth</u>, 524 U.S. at 765.  Proof that the employer has in place an anti-harassment policy that appears effective on its face will generally be sufficient to establish the first prong of the affirmative defense, unless the

employer failed to take reasonable care in implementing the policy and preventing or correcting harassing behavior.  <u>Gawley v. Indiana University</u>, 276 F.3d 301, 311-12 (7th Cir. 2001).  The reasonableness of the employer's actions to prevent harassment depends on the gravity of the alleged harassment.  <u>McKenzie v. Illinois Dept. of Transp.</u>, 92 F.3d 473, 480 (7th Cir. 1996).

Buchheit failed to take reasonable care to implement its policy with respect to Coleman.  The Handbook instructed employees to tell their supervisors, or a person in their chain of command, about any harassment.  Coleman told Beck, her supervisor, about Johnston's behavior.  Beck did nothing to help Coleman; in fact, she told Coleman to keep her mouth shut if she wanted to keep her job.  Beck, as a direct supervisor, was one of the people designated by Buchheit to implement its anti-harassment policy.  The Handbook told Coleman to go to her.  The person designated by Buchheit failed to implement the policy.  Worse, she told the victim to keep quiet about the harassment.  In Coleman's case, it is clear that Buchheit failed to take reasonable steps to implement its policy.

Buchheit argues that since Beck was a victim of Johnston's harassment also, she was not the appropriate person to whom Coleman should have

complained.  Buchheit argues that Coleman should have spoken to someone with supervisory authority over Johnston.  The Handbook does not tell a victim of harassment to speak to a supervisor with authority over the harasser; the Handbook tells a victim of harassment to speak to her supervisor, to someone in her chain of command, or to specified persons in the Buchheit managerial hierarchy.  Beck was Coleman's immediate supervisor in her chain of command.  Coleman followed the  Handbook by speaking to Beck.  Beck did nothing and eventually told Coleman to keep her mouth shut. Thus, Buchheit, through supervisor Beck, implemented the anti-harassment policy by instructing Coleman to keep quiet about the harassment.  Clearly Buchheit failed to take reasonable steps to implement the anti-harassment policy with respect to Coleman.

Buchheit argues that it took reasonable steps to implement the policy because it provided Coleman with other avenues to secure help to stop the harassment.  The Problem Solving section of the Handbook says that if the employee fails to get the problem resolved by speaking to a manager in her chain of command, she should submit the complaint in writing to specific members of the management hierarchy.  Further, Buchheit posted the Harassment Prevention poster, which directed employees to call specific

individuals in Buchheit's managerial hierarchy if they were victims of harassment.  If Coleman had contacted any of these people, the matter would have been addressed.  In fact, as soon as Tedeger called Hahn, as instructed on the Harassment Prevention poster, Buchheit management acted promptly to stop the harassment.

The problem with this argument is that once Coleman followed the policy by reporting the harassment to Beck, Buchheit had an obligation to act reasonably.  Buchheit did not.  Rather, Beck, Buchheit's agent authorized to implement the anti-harassment policy, told Coleman to keep quiet about Johnston's harassment if she wanted to keep her job.  Beck did not implement the policy effectively.  The availability of alternate recourse does not negate the undisputed fact that Buchheit's agent, Beck, failed to implement the anti-harassment policy.  Buchheit designated Beck, as Coleman's supervisor, as one of those Coleman could contact.  Buchheit, not Coleman, is responsible for Beck's failure to act once Coleman complained to her.  Thus, there is no factual dispute -- as to Coleman, Buchheit did not implement the policy effectively and failed to correct promptly the sexually harassing behavior of Johnston.

Coleman also did not unreasonably fail to take advantage of

preventive or corrective opportunities provided by Buchheit or to avoid harm otherwise.  Coleman followed the Handbook and told Beck.  Coleman acted reasonably.  Buchheit complains that Coleman should have done more, but the policy did not require her to do so.  Beck is the one who failed to act on the policy.  Moreover, Beck told Coleman to keep her mouth shut if she wanted to keep her job.  Once Beck told her to keep quiet, it was not unreasonable for Coleman to conclude that she would get no help from Buchheit management.  Coleman did not act unreasonably.  Buchheit's defense thus fails as to Coleman.  Coleman is entitled to partial summary judgment on the <u>Ellerth/Faragher</u> affirmative defense.

Issues of fact exist regarding whether Buchheit has a good <u>Ellerth/Faragher</u> affirmative defense to Lyons' harassment claims.  It is unclear whether Buchheit took reasonable steps to implement the policy with respect to Lyons.  Lyons spoke to Carrington about Johnston touching her shoulders.  She told Carrington that Johnston's touching surprised her. It is unclear whether Lyons told Carrington that she found Johnston's touches to be offensive.  A jury could conclude that Carrington reasonably took no further action because Lyons did not find Johnston's touching of her shoulders to be harassing or offensive.  Lyons also talked to Beck, but

it is unclear whether Beck was her supervisor at the time.  A jury could conclude Buchheit reasonably did not take any steps to implement the policy when Lyons talked to Beck because Lyons did not follow the policy; she did not speak to her supervisor, someone in her chain of command, or someone in upper management identified in either the Handbook or the Harassment Prevention poster.

Issues of fact also exist regarding whether Lyons unreasonably failed to take advantage of preventive or corrective opportunities.  Lyons spoke to Carrington, but, again she only said that Johnston's touching surprised her. A jury could conclude that she did not tell Carrington that she found Johnston's touches of her shoulders to be offensive.  Lyons also talked to Beck, but it is unclear whether Beck was her supervisor at the time.  A jury could conclude that Lyons should have followed the Handbook and spoken to her supervisor, someone in her chain of command, or someone in upper management, rather than Beck.  It is also unclear whether Lyons waited an unreasonable length of time to report the incidents to Beck.  A jury might also conclude that Lyons at some point unreasonably failed to take steps called for in the Handbook or on the Harassment Prevention poster.  Issues of fact, therefore, remain with respect to Buchheit's <u>Ellerth/Faragher</u>

affirmative defense against Lyons' sexual harassment claim.  Therefore, the Plaintiffs' sexual harassment claims will go to the jury, and Buchheit's Ellerth/Faragher affirmative defense against Lyons' claim will go to the jury. Coleman is entitled to summary judgment on the affirmative defense, however.

II.    RETALIATION

Title VII prohibits any employer from retaliating against an employee who has "opposed any practice made an unlawful employment practice by this subchapter or . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the statute.  42 U.S.C. § 2000e-3(a).  To establish retaliation, a plaintiff must:

> show that after filing the [sexual harassment complaint] only [the plaintiff], and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though [the plaintiff] was performing [the] job in a satisfactory manner.  If the defendant presents no evidence in response, the plaintiff is entitled to summary judgment.  If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, he is entitled to summary judgment.  Otherwise there must be a trial.

Stone v. City of Indianapolis Public Utilities Div., 281 F.3d 640, 644 (7th Cir. 2002).  An adverse employment action is a materially adverse change in the terms and conditions of employment.  Murray v. Chicago Transit

Authority, 252 F.3d 880, 887 (7th Cir. 2001).  A materially adverse change includes a demotion, a decrease in wage or salary, a less distinguished title, a material loss of benefits, or material reduction in responsibilities.  Oest v. Illinois Dept. of Corrections, 240 F.3d 605, 612-13 (7th Cir. 2001).

Neither Lyons nor Coleman suffered an adverse employment action after the July 2002 investigation and discipline of Johnston.  Neither suffered a demotion, a decrease in wage or salary, a less distinguished title, a material loss of benefits, or material reduction in responsibilities. Coleman complains that she did not get a raise that she was promised when she was transferred to Contract Sales, but the failure to give the promised raise occurred in June 2002, at the time of the transfer, before the July 2002 complaints and investigation.  The failure to give the raise, thus, was not retaliatory.

Williams' interview summary of Coleman also indicates that Coleman said in the interview that Johnston put her on nights after she made a comment about his language.  A shift change, without more, is not an adverse employment action.  Grube v. Lau Industries, Inc., 257 F.3d 723, 728-29 (7th Cir. 2001).  Moreover, Coleman's statement to Williams, as reflected in the summary, is inadmissible hearsay within hearsay.  See Fed.

R. Evid. 805.  As such, the Court should not consider it.  Fed. R. Civ. P.

56(e).  Further, Buchheit's payroll records show that her shift assignments

did not change in 2002.  Coleman and Lyons did not suffer any adverse

employment actions from the July 2002 complaints and investigations.

They, therefore, cannot make out a prima facie case of Title VII retaliation.

Buchheit is entitled to summary judgment on the retaliation claims.

III.   CONSTRUCTIVE DISCHARGE

Coleman claims that she was constructively discharged in September

2002.  Constructive discharge occurs if working conditions are so intolerable

as a result of unlawful conduct that a reasonable person would be forced

into an involuntary resignation.  Pennsylvania State Police v. Suders, 542

U.S. 129 (2004); Vitug v. Multistate Tax Com'n, 88 F.3d 506, 517 (7th Cir.

1996).  The conditions must be worse than an ordinary hostile work

environment because, "in the 'ordinary' case, an employee is expected to

remain employed while seeking redress."  Drake v. Minnesota Min. & Mfg.

Co., 134 F.3d 878, 886 (7th Cir. 1998).  See Simpson v. Borg-Warner

Automotive, Inc., 196 F.3d 873, 877 (7th Cir. 1999) and cases cited therein.

This is because generally, ". . . an employee is expected to remain employed

while seeking redress."  Tutman v. WBBM-TV, Inc./CBS, Inc., 209 F.3d

1044, 1050 (7th Cir. 2000) (internal quotations omitted).

Coleman resigned because: (1) male employees made snide comments, refused to help her lift heavy objects, and gave her the cold shoulder; and (2) Buchheit did not give her the raise that she was promised when she transferred to the Contract Sales Department. Coleman Dep. at 93, 95-96. The actions by the male employees did not make her workplace so intolerable that she faced conditions that were worse than the ordinary case of a hostile work environment. The failure to give the promised raise was not retaliatory because Cash had promised the raise at the time of the June 2002 transfer to Contract Sales, and failed to pay it before the July 2002 investigations and discipline. The failure to give the raise also did not make her working conditions so intolerable that she had to quit.

Coleman argues that Buchheit was going to make her go on an overnight trip with Johnston in September 2002. Coleman states in her deposition, however, that the trip had nothing to do with her decision to resign. She had already told Cash she was not going on the trip.

Coleman was not constructively discharged. Buchheit is entitled to summary judgment on this claim.

<u>CONCLUSION</u>

27

THEREFORE, Defendant Buchheit, Inc.'s Motion for Summary Judgment (d/e 53) is ALLOWED in part, and DENIED in part. Partial summary judgment is entered in favor of Defendant Buchheit, Inc., and against Plaintiffs Connie Coleman and Sara Lyons on Counts III, IV, and V of the First Amended Complaint (d/e 17). Defendant Buchheit's Motion is denied as to Counts I and II. Plaintiffs' Motion for Partial Summary Judgment Proscribing Defendant's Assertion of the Ellerth/Faragher Affirmative Defense (d/e 101) is ALLOWED in part and DENIED in part. The Motion is allowed with respect to Buchheit's affirmative defense to Coleman's hostile work environment claim in Count I, but not as to its affirmative defense to Lyons' hostile work environment claim in Count II.

IT IS THEREFORE SO ORDERED.

ENTER:  September 1, 2005.

FOR THE COURT:

s/  Jeanne E. Scott
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE